OPINION
PER CURIAM.
Anita Puteri Sanjata (“Sanjata”), an ethnic-Chinese Christian, is a native and citizen of Indonesia. She entered the United States in October 1998 on a visitor’s visa with authorization to remain until April 22, 1999. Sanjata overstayed her visa and filed an administrative application for asylum in May 2001, which was denied. The Government charged her with removability for overstaying her visa. Before the IJ, Sanjata conceded removability and applied for asylum, withholding of removal, and relief under the Convention Against Torture (“CAT”).[1] She also requested voluntary departure.
I
In her asylum application, Sanjata explained that she had experienced mistreatment in Indonesia based on her religion and ethnicity. Throughout her childhood, Muslim Indonesians shouted ethnic slurs *264 at her in public. At the age of 13, when Sanjata was waiting for her parents after school, a teenager on a bicycle approached her and forcibly grabbed her breast, shouting an ethnic slur as he rode away. Men nearby laughed and offered her no help. She testified that she and her friend fled the scene because they worried that the “native guys laughing at us would harass us[,] too.” A.R. 247.
While in high school, a gang of children attacked Sanjata’s brother and stole his necklace. When their mother contacted the police, she was rebuffed because of her ethnicity.
Later, Sanjata and her boyfriend were involved in a minor car accident. When her boyfriend attempted to assist the other driver, a mob of Muslim Indonesians, including the other driver, assaulted the boyfriend and relented only when he gave them money. They did not report the incident because they feared that the police would not help.
Following a soccer game, Sanjata, who was driving with her mother, witnessed angry Indonesians attacking ethnic-Chinese people. However, Sanjata and her mother escaped without incident.
On another occasion, Sanjata was injured in a motorcycle accident. She and her family went to the police the next day to reclaim the motorcycle. The police improperly charged Sanjata’s mother money to file a report. They never heard from the police about the matter again.
Finally, Sanjata was in Jakarta when anti-Sino-Christian riots broke out in 1998. Although she escaped to the airport and never encountered any violence, she witnessed the chaos as her plane departed Jakarta. She left for the United States soon after.
The Immigration Judge denied Sanjata’s application, reasoning that her asylum application was time-barred and, alternatively, without merit. Although he found her testimony credible, the IJ reasoned that the incidents Sanjata described did not rise to the level of persecution, either individually or cumulatively. He also concluded that she failed to demonstrate a likelihood that she would be singled out for persecution if she returned to Indonesia, or that a pattern or practice of persecution against Chinese Christians exists there. The IJ also denied Sanjata’s request for withholding and CAT protection, but granted her request for voluntary departure. The BIA affirmed for substantially the reasons given by the IJ. Sanjata presents a petition for review.
II
We have jurisdiction over Sanjata’s petition under 8 U.S.C. § 1252(a). Because the BIA issued its own opinion, we review its decision rather than that of the IJ. See Li v. Att’y Gen., 400 F.3d 157, 162 (3d Cir.2005). However, we review the decision of the IJ to the extent that the BIA defers to or adopts the IJ’s reasoning. See Chavarria v. Gonzalez, 446 F.3d 508, 515 (3d Cir.2006). We review agency factual determinations for substantial evidence, and will uphold such determinations “unless the evidence not only supports a contrary conclusion, but compels it.” Zhang v. Gonzales, 405 F.3d 150, 155 (3d Cir.2005) (internal citations omitted). We review legal questions de novo, subject to established principles of deference. See Cospito v. Att’y Gen., 539 F.3d 166, 171 (3d Cir.2008).
Petitioner raises only two cognizable arguments on appeal: 1) she demonstrated eligibility for withholding of removal based on events which, viewed cumulatively, amount to past persecution, and 2) she demonstrated eligibility for withholding of removal based on a pattern or practice of *265 persecution against Chinese or Christians in Indonesia.[2] We address each argument in turn.
“The threshold for establishing eligibility for withholding of removal is higher than that for establishing entitlement to asylum and requires the alien to demonstrate a ‘clear probability’ that, upon removal to the country of origin, his or her ‘life or freedom would be threatened on account of one of the statutorily enumerated factors.’ ” Obale v. Att’y Gen., 458 F.3d 151, 161 (3d Cir.2006) (quoting Senathirajah v. INS, 157 F.3d 210, 215 (3d Cir.1998)). The clear probability standard is met if the petitioner shows that it is more likely than not that she will suffer persecution. See Miah v. Ashcroft, 346 F.3d 434, 439 (3d Cir.2003). Persecution includes “threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom.” Fatin v. INS, 12 F.3d 1233, 1240 (3d Cir.1993). However, it “does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional.” Id.
Sanjata argues that the BIA erred in its determination that the incidents she experienced in Indonesia, when viewed cumulatively, do not amount to persecution. The incidents Sanjata experienced are indeed troubling, but it is not clear that they amount to the conduct described in Fokin. We cannot say that the record compels disagreement with the BIA’s analysis. See Jarbough v. Att’y Gen., 483 F.3d 184, 191— 92 (3d Cir.2007).
Alternatively, an alien may satisfy the clear probability standard by demonstrating a genuinely held subjective fear of persecution and the existence of a “ ‘pattern or practice in his or her country of nationality ... of persecution of a group of persons similarly situated , to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion....’” Sukwanputra v. Gonzales, 434 F.3d 627, 637 (3d Cir.2006) (quoting 8 C.F.R. § 208.13(b)(2)(iii)(A)). In that regard, Sanjata argues that the BIA incorrectly determined that no pattern or practice of persecution against Chinese Christians exists in Indonesia. Notwithstanding the evidence presented by Sanjata of the lower status endured by Chinese Christians in Indonesia, we agree with the Government that the 2005 and 2006 U.S. State Department Country Reports relied on by the IJ and BIA do not demonstrate a pattern or practice of persecution. Indeed, recent cases from this Circuit indicate a trend toward better treatment for Chinese Christians. See, e.g., Sioe Tjen Wong v. Att’y General, 539 F.3d 225, 233-34 (3d Cir.2008) (noting that State Department reports from 2005 to 2007 describe better conditions for Chinese Christians in Indonesia). As such, Sanja-ta’s argument lacks merit.
Accordingly, we will deny the petition for review.

. The asylum application Sanjata filed with the IJ differed substantially from her administrative application. Sanjata initially filed for asylum in May 2001 with the assistance of an entity later charged with submitting fraudulent claims. However, Sanjata demonstrated to the satisfaction of the IJ that she was not complicit in any fraudulent filing and he permitted her to file a new asylum application. Our review, like the agency’s, considers the claims raised in her second application, not the first.

. Sanjata raises other arguments in her brief and reply brief that we do not consider because the claims were not exhausted in agency proceedings, including whether the "organized, systemic or pervasive” standard is a disjunctive test that could be satisfied by any one of its elements. See Bonhometre v. Gonzales, 414 F.3d 442, 447 (3d Cir.2005). We also note that Sanjata does not raise any claims related to the agency determination that her asylum application was untimely. Even if she did, we lack jurisdiction to entertain such claims. See Tarrawally v. Ashcroft, 338 F.3d 180, 185 (3d Cir.2003)